

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-22-00257-CV

**IN THE INTEREST OF A.L.S.**, A.L.S., S.A.S., Children

From the 49th Judicial District Court, Webb County, Texas
Trial Court No. 2018-FLD-002274-D1
Honorable Selina Nava Mireles, Judge Presiding

Opinion by:    Beth Watkins, Justice

Sitting:    Rebeca C. Martinez, Chief Justice
Beth Watkins, Justice
Lori I. Valenzuela, Justice

Delivered and Filed: October 19, 2022

AFFIRMED

Appellant S.S. (Father) challenges the trial court's order terminating his parental rights to his children A.L.S. (born 2015), A.L.S. (born 2016), and S.A.S. (born 2019).[1] Father argues the evidence is legally and factually insufficient to support the trial court's findings under Texas Family Code section 161.001(b)(1)(D), (E), and (O) and its finding that termination is in the best interest of the children. Father also argues the evidence does not support the trial court's conclusion that he failed to carry his burden on an affirmative defense to the subsection O finding. We affirm.

---

[1] To protect the privacy of the minor children, we use initials to refer to the children and initials or pseudonyms to refer to their biological parents. TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

**BACKGROUND**

On November 9, 2018, the Laredo Police Department executed a search warrant at Father's home. The children's mother, S.B. (Mother), was the target of the warrant, but the police executed the warrant at Father's home because they had received information that Mother lived there. After the search, the police arrested Mother, Father, and a third adult who was in the home. The two older children, A.L.S. and A.L.S., were present during the search and arrest; the youngest child, S.A.S., had not been born yet. The police contacted the Texas Department of Family and Protective Services to report possible neglectful supervision of A.L.S. and A.L.S. The Department removed A.L.S. and A.L.S from the home, obtained temporary managing conservatorship over them, placed them in foster care, and filed a petition to terminate Father's and Mother's parental rights.

In April of 2019, the Department removed S.A.S. from the hospital where he was born after both he and Mother tested positive for benzodiazepine. At that time, the Department's petition to terminate Father's and Mother's parental rights to A.L.S. and A.L.S. was pending. The Department obtained temporary managing conservatorship over S.A.S., placed him in the same foster care as his sisters, and filed a second petition to terminate Father's and Mother's parental rights. The two cases were eventually consolidated.

The Department created a family service plan for Father after the removal of A.L.S. and A.L.S. and again after the removal of S.A.S. The first service plan required Father to, inter alia, undergo individual counseling; abstain from criminal conduct, including buying and selling drugs; and test negative for illegal drugs for at least six consecutive months as a condition of reunification. The second service plan required Father to complete those same steps, but it also specified that he must "not allow those that [he was] aware of abusing drugs into [his] home," and it noted his awareness that "[i]f [Mother] does not complete services successfully . . . she must not be around

the home if the children were to be placed with [Father]." The Department ultimately pursued termination of Father's parental rights.

On April 8, 2020, approximately a year after S.A.S.'s removal and seventeen months after the older children's removal, the trial court began the bench trial in this case. The trial continued on December 17, 2020, January 8, 2021, March 4, 2021, May 26, 2021, and June 8, 2021. The trial court heard testimony from eight witnesses: (1) Juan Gilbert Perez, the police officer who executed the search warrant and called the Department; (2) the Department's investigator, Glenda Rosales, who removed all three children; (3) the Department's caseworker, Roxanne Maciel; (4) therapist Lisa Martinez; (5) therapist Daniel Browne; (6) Mother's grandmother; (7) Mother; and (8) Father. On March 4, 2022, the court signed an order terminating Father's and Mother's parental rights pursuant to section 161.001(b)(1)(D), (E), and (O) and its finding that termination of Father's and Mother's parental rights was in the best interest of the children. On April 5, 2022, the trial court signed a first amended order of termination that repeated the findings in the original order. Father timely appealed.[2]

## ANALYSIS

### *Applicable Law and Standard of Review*

The involuntary termination of a natural parent's rights implicates fundamental constitutional rights and "divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent." *In re S.J.R.-Z.*, 537 S.W.3d 677, 683 (Tex. App.—San Antonio 2017, pet. denied) (internal quotation marks omitted). "As a result, appellate courts must strictly scrutinize involuntary termination proceedings in favor of the parent." *Id.* The Department had the burden to prove, by clear and

---

[2] Mother is not a party to this appeal.

convincing evidence, both that a statutory ground existed to terminate Father's parental rights and that termination was in the best interest of the children. TEX. FAM. CODE ANN. § 161.206; *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *In re S.J.R.-Z.*, 537 S.W.3d at 683.

When reviewing the sufficiency of the evidence supporting a trial court's order of termination, we apply well-established standards of review. *See In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). In reviewing the legal sufficiency of the evidence to support the trial court's findings, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id.* at 345. A factual sufficiency review requires us to consider the entire record to determine whether the evidence that is contrary to a finding would prevent a reasonable factfinder from forming a firm belief or conviction that the finding is true. *See id.* The factfinder is the sole judge of the weight and credibility of the evidence. *Id.* at 346.

### *Statutory Termination Grounds*

#### *Applicable Law*

In his first, second, and third issues, Father challenges the legal and factual sufficiency of the evidence to support the trial court's findings under section 161.001(b)(1)(D), (E), and (O). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O). In his fourth issue, Father challenges the trial court's conclusion that he did not establish an affirmative defense to subsection O. *See* TEX. FAM. CODE ANN. § 161.001(d).

Where, as here, the trial court terminates a parent's rights on multiple predicate grounds, we may generally affirm on any one ground. *In re A.V.*, 113 S.W.3d at 362; *In re D.J.H.*, 381 S.W.3d 606, 611–12 (Tex. App.—San Antonio 2012, no pet.). However, because termination under subsections D or E may have implications for a parent's parental rights to other children, appellate courts must address a parent's challenges to a trial court's findings under those subsections. *In re N.G.*, 577 S.W.3d 230, 236–37 (Tex. 2019) (per curiam). We consolidate our analysis as to subsections D and E because the evidence concerning those two grounds is interrelated. *See In re J.T.G.*, 121 S.W.3d 117, 126 (Tex. App.—Fort Worth 2003, no pet.).

Subsection D allows a trial court to terminate parental rights if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D). Under subsection D, the trial court examines "evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being." *In re J.T.G.*, 121 S.W.3d at 125. "Endanger" means to expose to loss or injury or to jeopardize. *Id.* "Environment" refers to the acceptability of the child's living conditions and a parent's conduct in the home. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards." *Id.* A parent does not need to know for certain that the child is in an endangering environment. *In re R.S.-T.*, 522 S.W.3d 92, 109 (Tex. App.—San Antonio 2017, no pet.). Awareness of a potential for danger is sufficient. *Id.* The relevant period for review of environment supporting termination under subsection D is before the Department removes the child. *In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

Subsection E allows a trial court to terminate a parent's rights if it finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). Under subsection E, the trial court determines whether there is evidence that a parent's acts, omissions, or failures to act endangered the child's physical or emotional well-being. *See In re J.T.G.*, 121 S.W.3d at 125. "It is not necessary that the parent's conduct be directed at the child or that the child actually be injured; rather, a child is endangered when the environment or the parent's course of conduct creates a potential for danger which the parent is aware of but disregards." *In re R.S.-T.*, 522 S.W.3d at 110 (internal quotation marks omitted). Courts may further consider parental conduct that did not occur in the child's presence, including conduct before the child's birth or after the child was removed from a parent's care. *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *4–5 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied) (considering whether evidence supported termination under subsection E).

*Application*

Father argues the evidence is legally and factually insufficient to support termination of his parental rights under subsections D and E because he and Mother both testified that he did not know Mother had brought drugs into the home on the day of the older children's removal. He also contends there is no evidence that the children were physically or emotionally abused or medically neglected. Finally, he argues that S.A.S. was removed due to Mother's actions, not Father's.

**A.    Evidence presented at trial**

Over the course of the six-day trial, the parties presented testimony from eight witnesses. The trial court also admitted twenty-eight exhibits into evidence.

1.    Juan Gilbert Perez

Perez is a Laredo Police Department officer who helped execute the search warrant at Father's home on the day of the two older children's removal. Perez testified the police had received information that Mother lived in Father's home and was planning to sell marijuana there. He stated he had not seen any indication that Father planned to sell drugs.

Perez testified that when the police arrived, the two older children, Mother, Father, and a third adult were in the living room. Perez described the room as a "a small, confined space." He saw smoke and smelled a "strong odor of marijuana" inside the home, "especially inside the living room." During their search, officers found a quarter pound of marijuana in a bag hanging from the back of the front door. They also found approximately 8.5 grams of additional marijuana and drug paraphernalia, including a grinder and pipes, in other locations in the living room and in the adults' pockets. The police did not find any other drugs. Perez testified that the children were "right there where all the drugs were." He testified the children could not reach the marijuana hanging from the front door but that the other marijuana in the room was accessible to them. He also testified that one of the children handed him a half-smoked marijuana cigarette the child had picked up off the floor.

Perez testified that he saw "a lot of mess thrown everywhere on the ground, food, liquids." He continued, "[Y]ou could barely walk. . . . I just couldn't understand how the kids were surviving there like that in those conditions." He did not believe the home was suitable for children because "it was too hazardous, especially the drugs being there in plain view or where the kids had

access to[.]" He further noted that the children "were dirty[.]" He did not see any indication that the children were physically abused, and he stated they did not appear to be malnourished.

Perez testified that the police arrested Mother, Father, and the third adult for possession of marijuana. He stated that all three arrestees were charged with state jail felonies, but he acknowledged the charges did not include allegations of selling marijuana or conspiracy to distribute marijuana. He also stated that while he had concerns about the state of the home and the children's exposure to drugs, it was not his job to determine whether the children should be removed. He therefore called the Department "just to advise them of the poor conditions[.]" Under cross-examination, he agreed that his only basis for concluding the children were not safe was the fact that one of them had handed him a marijuana cigarette.

### 2.    Glenda Rosales

Rosales is the Department investigator who responded to Father's home after Perez called the Department. She testified "this was an immediate callout" that she would have responded to quickly. When she entered the home, she saw a lighter and a marijuana pipe on a TV stand that the children, who were two and three at the time, could reach. Like Perez, Rosales testified that "[t]he home was not clean." Rosales saw clothing and trash on the floor and rat feces under the sink.

Rosales agreed with Perez that the children "did not appear clean." She noted that the children both had lice and nits in their hair, and one child had a diaper rash. She also explained that the children tested negative for drugs after they were removed. However, they "smelled of marijuana. . . . If you would get close to them, you could smell them." Like Perez, Rosales did not see any indication that the children had been physically, emotionally, or medically abused or that they were malnourished.

During her investigation, Rosales spoke with Father's landlord, who told her he was renting the home to both parents. Father, in contrast, told Rosales that Mother did not live with him and was only there to pay the cable bill. He reported that the house smelled of marijuana because Mother and the third adult had been smoking outside and the smell drifted inside. He said the children were asleep and "he was in and out of sleep" when police arrived. He told Rosales that he had smoked marijuana a couple of weeks before, but he stated the drugs and paraphernalia the police found were Mother's and that he did not know Mother had brought drugs into the home. Father denied knowing that Mother planned to sell drugs from his home.

Mother told Rosales that she and the third adult had arranged to exchange marijuana for unprescribed Xanax and Zoloft because Mother was addicted to those medications. She told Rosales the mess in the home was from the execution of the warrant and that Father did not know about the planned drug transaction.

Rosales testified that the Department recommended that A.L.S. and A.L.S. be removed based on neglectful supervision. She explained this determination was based on the children's access to the marijuana in the home, but stated the Department "had to also take into consideration the family's history with the Department." She testified that history showed Father had previously been granted conservatorship of A.L.S. and A.L.S. on the condition that he "agreed to a protective order against mother." Rosales testified Father did not have a protective order against Mother and that the Department "had information that she was living" in Father's home. She also noted that while A.L.S. and A.L.S. had not been physically abused, "[t]here was neglect" because Father "did allow [Mother] to go into the home knowing her history" of drug use and because the children had access to the marijuana in the home. Rosales's removal affidavit, which the trial court admitted into evidence, stated that Father told Rosales "he allowed [Mother] into his home as she visits frequently" but that Mother "is not a caregiver to the children." The affidavit also explained

Mother's and Father's history with the Department and noted that Father had previously failed to follow court orders regarding the children.

Rosales testified that several months after the Department removed A.L.S. and A.L.S., a hospital contacted the Department to report that Mother and a newborn child, S.A.S., had tested positive for benzodiazepine at the child's birth. Mother also tested positive for cocaine. Based on these facts, the Department removed S.A.S. from the hospital and placed him in the same foster care as his sisters. Rosales testified the Department did not release S.A.S. to Father because he "had not been following his service plan [for A.L.S. and A.L.S.]." She also noted that she interviewed Father during her investigation of the allegations regarding S.A.S. and that he admitted to smoking marijuana while the older children's case was pending.

### 3.    Roxanne Maciel

Department caseworker Maciel testified that she prepared service plans for Father and Mother after the removal of A.L.S. and A.L.S. and again after S.A.S.'s removal. She testified that both parents reviewed and signed the service plans and agreed to comply with them. The trial court admitted the service plans into evidence.

Throughout this case, both Mother and Father reported to Maciel that they did not live together and were no longer romantically involved. But Maciel testified that "there were always indications that . . . [Mother] continued to live with [Father]." She noted Mother was arrested again at Father's house in August of 2019, after all three children had been removed and at a time when Mother and Father "were already claiming that they were no longer together."

Maciel testified that at the beginning of this case, "[Father] was doing really well." At one point, the Department was "looking at reunifying [the children] with him" because he appeared to have completed his required services. When Father completed his services and "had all his recommendations ready," the Department asked him to undergo a hair follicle test as a final step

toward reunification. But when Father appeared for the test, his hair was not long enough, so Maciel asked him to undergo a urinalysis on the spot. That urinalysis was positive for marijuana.

Maciel testified that she knew Father had been diagnosed with cannabis use disorder, which she described as an addiction to marijuana. She testified, however, that prior to the "on the spot" urinalysis, Father had always tested negative for drugs. She pointed out that Father had consistently received advance notice of those prior drug tests, and explained that "when this positive came up . . . it kind of raised some red flags that, well, he had been testing negative and all of a sudden, he tested positive again." After the positive test, the Department required Father to "reinitiate his services all over again." Father subsequently tested positive for cocaine.

Father also missed several drug tests. Maciel testified that the Department sent Father for a hair follicle test three times, but he never submitted to that test. She noted the Department told Father to stop shaving his beard and body so it could perform the test, but Father continued shaving. Maciel also testified that after the trial court ordered Father to submit to a nail clipping test in May of 2020, Father clipped his fingernails and toenails to a length that made the test impossible. In October of 2020, Father told the Department he appeared for a hair follicle test and the testing facility told him his hair was too short, but the facility reported Father never appeared for the test.

Maciel testified that "[t]he Department was able to obtain the Webb County recordings of the phone calls" Mother made to Father during Mother's incarceration after her August 2019 arrest. Those recordings, which were admitted into evidence at trial, included conversations between Mother and Father about Father's purchase and use of fake urine to pass drug tests. Maciel stated these recordings gave the Department reason to doubt Father's earlier negative drug tests.

The recordings also included conversations showing that Mother and Father were romantically involved and were attempting to hide their relationship from the Department. After

hearing these phone calls, Maciel and her supervisor "had a conversation with [Father]" and "told him, you know, this is—you're getting another chance, you know, it's either [Mother] or the children at this point." The Department told Father it was important for him to avoid contact with Mother because "she continues to be abusing drugs, engaging in—in behaviors that are dangerous, you know, to—for a child to be around." Maciel testified Father indicated he understood that continuing a relationship with Mother would jeopardize his chance for reunification with the children, but he nevertheless maintained contact with Mother. During one of Maciel's visits to Father's home, she saw "many female items there," and Father admitted those items belonged to Mother. Maciel testified that Father "blames [Mother] for everything" and that both Mother and Father had represented to her that Mother was "the one who causes the problems," but she noted they still kept a "pattern of them continuing to be in a relationship." Based on her observations of Father during this case, Maciel opined that Father had "not been able to let go of [Mother]."

Maciel recommended termination of Father's parental rights because he had "allowed [Mother] access to these children." Maciel explained, "[Mother] never physically harmed the children that we know of, but her behaviors are dangerous." She stated that even when the Department planned to reunify Father with the children, that reunification would have been under the condition "that he was to be protective of these children by not allowing mom to have access to them." She also testified that while Father appeared to have completed his services the first time he was ordered to do so, that completion was called into question by his falsification of drug tests. As to Father's second attempt at completing services, Maciel testified Father did not complete his individual therapy, that his contact with the Department was "very minimal" and "evasive," and that he stopped visiting the children in October of 2020.[3]

---

[3] Maciel gave this testimony on March 4, 2021.

### 4.     Lisa Martinez

Martinez is one of two counselors who treated Father during this case. She testified that Father's treatment plan required him to, inter alia, "ensure that he did not have contact with [Mother]" and refrain from using "illegal substances." She testified that Father had attended three sessions with her and missed four. She did not feel he would be able to complete his service plan because "[t]here was a lapse of treatment," stating that she had "not seen [Father] in the last eight months." She did not believe Father had made sufficient progress to allow her to give a recommendation in favor of reunification, but she clarified that her conclusion was based on his progress as of when she last saw him in October 2020. She testified that if Father had continued attending counseling, she would have recommended "ensuring that he has his own support system, that he stays away from [Mother], and more than anything refraining from substance use."

### 5.     Daniel Browne

Browne is another counselor who treated Father during this case. He also performed a psychosocial assessment of Father's strengths, weaknesses, and social history. Browne testified that Father was referred for counseling "because he was exposing his children to marijuana. So, the services in individual counseling had to do in reference to protectiveness, being protective with his children, learning to be a responsible parent, avoiding any substance abuse issues, and basically become a better parent—protective for his children."

Father underwent two rounds of counseling with Browne. Father was successfully discharged after the first round. Browne's notes from that round of counseling state that at that time, Browne would "not hesitate recommending the reunification of [Father] with his children as long as there is a protective order in place preventing mother to be around her children without the proper supervision of CPS." Browne's notes from this round of counseling indicate that Father admitted he allowed Mother to return to the children's lives after the closure of a prior CPS case.

Father returned for the second round of counseling after the Department learned he had been falsifying his drug tests. Browne testified, "[O]n the second occasion [Father] was not successful. He participated maybe in eight sessions, but he was absent in six so his consistency on this second participation was not—not that good."

Browne diagnosed Father with cannabis use disorder, which he described as marijuana use "in a certain frequency or if it's interfering with certain legal responsibilities and so on." Browne testified that Father claimed that he used marijuana to help him focus and function, but he stated Father also reported that he used marijuana more for recreational purposes than therapeutic ones. Browne agreed that if Father truly needed marijuana to function, he would need more than therapy to stop using.

During the second round of counseling sessions, Father reported to Browne that he maintained contact with Mother because she helped him with money for rent and marijuana. Browne observed that Father did not seem to be able to pay his bills without financial assistance from Mother. Browne testified that Father admitted he "had a personality of using people for his personal gain," and Father told Browne he did not care what Mother did as long as she helped him financially. Browne testified he found this self-assessment concerning because:

> when you have children . . . there's certain benefits that you can claim, maybe the childcare or maybe Medicaid or maybe food stamps. And if this person is highly dependent on using other people and if he has not worked through that deficiency of being—utilizing other people he might use [A.L.S. and A.L.S.] for beneficial— financial gain in some way.

Similarly, Browne's notes from the second round of counseling state:

> [Father] appears to have a lack of ethical morals, displayed by using the mother of his children to supply his marihuana and help him financially with some necessities. [Father] admitted he would not care how [Mother] would obtain the money to help him and admitted he would not have any regards for her but would show his affection towards her only for his own benefit. . . . Counseling may be beneficial for [Father] only if he modifies his moral principles to show respect and regard to other people and stop using people for his personal gain.

In his notes, Browne expressed concern that Father "might use these children for some financial benefit."

Browne testified that he "was not able to give a favorable recommendation" for reunification after the second round of counseling. He stated his assessment was based on his observations as of March of 2020 and stressed that he "cannot tell you what [Father's] life is right now." He also stated, however, "I can tell you . . . that there's some habits that are very difficult to change." Browne testified that Father knew his drug use could impair his ability to be reunified with the children, and his notes indicate that Father knew the court had "instructed him to end the unhealthy relationship he was having with [Mother]."

### 6. Mother's grandmother

Mother's grandmother testified briefly about Mother's childhood and young adulthood. When asked how Father and Mother treated the children, she testified, "They seem to be fine." She had never seen Father or Mother emotionally or physically abuse the children or do anything to place them in harm's way.

### 7. Mother

Mother described Father as a "great father" and her "best friend" who changed the children's diapers, cooked, cleaned, and did "everything else." She stated that his relationship with A.L.S. and A.L.S. was the kind of bond she "would've wanted with [her] father." She testified that Father "was real protective over [the children]. He wouldn't even leave them with me" and that she hid things she did from Father "because he protected [the children] so much." She stated Father was not aware of the planned drug transaction on the day of the older children's removal and that if he had known, "[h]e would've kicked [her] out of the house." She denied having ever given Father marijuana or money for bills, but also stated that she "never let them be without anything."

Mother denied that she had neglected or abused the children, but she agreed she had endangered them by bringing drugs into the home. She also agreed that she had been told to stop associating with Father but had continued to do so. She believed the Department removed the children from Father "because of [her] fault" and "all because he couldn't turn [Mother] away . . . or give up on [her]." She believed Father "deserves to have [their] children, and [their] children deserve to be with him." Mother acknowledged, however, that Father had told her he bought fake urine to use in his drug tests "because he was dirty for marijuana."

### 8. Father

Father described himself as "very good with children," "very patient," and "never overwhelmed." He testified that he used marijuana to help him with anxiety and focus, and he explained he "can tend to get overwhelmed from time to time" without marijuana. He explained that he "would go through [Mother]" to obtain marijuana and "she would be the one to get it for me" because he did not know anyone in Laredo. He testified that it would "be very difficult for [him] to find marijuana" in Laredo without Mother's help.

Father was aware that the Department changed its goal for the children from reunification to termination due to his use of marijuana, and he agreed that if he had stopped using marijuana the children probably would have been returned to him by the time of trial. He admitted buying fake urine to use in drug tests. He also admitted that he had clipped his fingernails and toenails after the trial court ordered a nail clipping test because he did not want to "come out dirty for marijuana."

Father testified that he was living in a long-term stay hotel at the time of trial. He was not employed at that time, but he identified three jobs he had held throughout this case. He told the trial court he planned to find a new job and that he believed he could pass a drug test because he knew "to stop for a few days before [the test] so that I can make sure my system gets clean." His

plans for the children included moving into an area where he wanted them to attend school, and he stated that if the children were returned to him, he would use CBD instead of marijuana to help with his focus.

Father testified that all three children were removed from Mother at birth, and the Department placed the two older children with him after their births in 2015 and 2016. He stated that Mother was not living with him "right now" and testified that on the day the older children were removed in 2018, Mother "was only supposed to come and just drop off money" but she asked to "hang out real quick for a few minutes." Father stated that after he agreed to let Mother stay, "she went outside for a little bit, came back inside and then she introduced me to somebody and then that was—you know, shortly after that is when the officers came in." When Father was asked if he knew what Mother "was up to" that day, Father testified:

> I didn't know exactly the details of what she was doing, you know, I—and I'm not to—to hear and sound like I was completely blind to—so, I knew—I didn't know in details exactly what [Mother] was doing. I never asked. I didn't care to ask. I had so much things on my plate on a day-to-day basis that I didn't—I didn't care. I didn't ask. I didn't wanna know at the end of the day as long as nothing was going down at my house or nothing that was gonna put me and the girls in danger[.]

Father appeared to attribute the smoke Perez saw during the execution of the search warrant to burning cooking oil in the kitchen.

Father testified "that any house with any drugs in it is not a good home for kids," and stated that he "use[d] marijuana but [did] not smoke it around [the children]." He explained that he would use marijuana "usually [in] the restroom or something and my stuff was always up there." He was aware of Perez's report that one of the children had picked up a marijuana cigarette off the floor, but he testified that his home was nevertheless "a safe environment":

> [The children] don't touch the marijuana. They would never grab that stuff. That stuff is never in a reachable area for children. There's usually always a place where it's high or it's put away or stuff like that because the marijuana user I am, I don't

smoke, like, a joint or a blunt because you get more THC concentrate out of just smoking it in a pipe.

Father testified that the drugs found in his home on the day of the children's removal were not his, that he did not know there was any marijuana in the house that day, and that the paraphernalia the police found "was taken out of [the adults'] pockets and placed on the t.v. by the arresting officers."

Father testified that he stopped visiting the children during this case because he wanted them "to get used to not seeing me" in the event they were not returned to him. He believed that he had made a good faith effort to comply with his service plan and that it would negatively affect the children if the court terminated his parental rights.

## B. Does the evidence support the trial court's findings under subsections D or E?

### 1. Legal sufficiency

"[I]nappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the 'conditions or surroundings of the child's home' under section D." *In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (internal quotation marks omitted). Similarly, "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct" under subsection E. *In re J.O.A.*, 283 S.W.3d at 345. "Evidence that a parent continued to use illegal drugs even though the parent knew her parental rights were at risk is conduct showing a voluntary, deliberate, and conscious course of conduct, which by its nature endangers a child's well-being." *In re K.J.G.*, 2019 WL 3937278, at *5.

It is uncontroverted that Mother's conduct, particularly her drug use, posed a danger to the children; Mother herself admitted as much at trial. Similarly, Father agreed "that any house with any drugs in it is not a good home for kids." The Department presented evidence that Mother helped pay Father's bills by "prostituting herself" and that Mother and Father sought to hide

Father's drug use and his relationship with Mother from the Department. While Father argues on appeal that he did not know Mother brought drugs into his home or intended to sell drugs on the day of the older children's removal, he testified at trial that he "didn't know exactly the details of what she was doing" because he "never asked" and "didn't care to ask." Based on this testimony, the trial court could have reasonably inferred that Father was aware of a potential for danger but consciously disregarded that danger. *See In re S.R.*, 452 S.W.3d at 360.

Additionally, the trial court heard extensive evidence about Father's use of marijuana. Browne testified that he diagnosed Father with cannabis use disorder, and he explained that diagnosis indicates a patient uses marijuana to an extent that "interfere[s] with certain legal responsibilities." Father testified that Mother was his primary source for the marijuana he used and that it would "be very difficult for [him] to find marijuana" without Mother's help. Browne testified that Father had told him he only maintained a relationship with Mother because she supplied him with drugs. This evidence shows a direct connection between Father's drug use and Mother's continued presence in Father's life—and, by extension, the children's lives. *See In re L.C.L.*, 599 S.W.3d 79, 84 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (en banc) (holding that subsections D and E require "a causal connection between [a parent's] drug use and the alleged endangerment"). Additionally, the Department presented evidence that Mother was a frequent visitor to—and possibly a resident of—Father's home both before and after the children were removed. Based on this evidence, the trial court could have reasonably concluded that Father's use of marijuana and his relationship with Mother compelled the children to associate with Mother and her endangering behaviors "on a regular basis in the home." *See In re M.D.M.*, 579 S.W.3d at 764; *see also In re J.O.A.*, 283 S.W.3d at 345.

Because S.A.S. was removed at birth due to in utero drug exposure, Father argues the evidence shows any danger to S.A.S. arose solely from Mother's conduct. Father does not argue,

however, that subsections D or E prohibited the trial court from considering conditions that existed or conduct that occurred before Mother's pregnancy with S.A.S. *See, e.g.*, *In re K.J.G.*, 2019 WL 3937278, at *4–5; *In re R.S.-T.*, 522 S.W.3d at 109–10. In any event, the Texas Supreme Court recently agreed "that a parent's knowledge of the other parent's drug use during pregnancy and corresponding failure to attempt to protect the unborn child from the effects of that drug use can contribute to an endangering environment and thus support an endangerment finding." *In re J.W.*, 645 S.W.3d 726, 749–50 (Tex. 2022). There is no direct evidence that Father knew Mother used drugs during her pregnancy with S.A.S. The evidence shows, however, that Father knew Mother used drugs; Father knew the Department had removed the two older children from Mother at birth; both Mother and Father were arrested for drug possession in November of 2018; Mother admitted an addiction to pills at the time of her arrest; Mother and Father had regular contact with each other prior to and after their arrest; and S.A.S. was born nearly full-term[4] approximately five months after Mother and Father were arrested. Based on this evidence, the trial court could have reasonably inferred that Father knew Mother used drugs during her pregnancy. *See In re J.A.V.*, 632 S.W.3d 121, 134 (Tex. App.—El Paso 2021, no pet.).

Finally, Father admitted that he stopped visiting the children in October of 2020, and the Department presented evidence that he did not finish the counseling required by his service plan and continued to use drugs in violation of the service plan. A parent's missed visits with a child and his failure to complete a service plan can support an endangerment finding because such conduct "generally subjects a child to a life of instability and uncertainty." *In re A.R.M.*, 593 S.W.3d 358, 371 (Tex. App.—Dallas 2018, pet. denied). Because Father testified that he and the two older children had a strong bond and that he believed the children missed him, the trial court

---

[4] S.A.S.'s medical records, which were admitted as evidence at trial, show he was born at thirty-seven weeks' gestation.

could have concluded that Father's voluntary decision to stop visiting the children was destabilizing and therefore relevant to an endangerment finding.

Based on these facts, a reasonable factfinder could have formed a firm belief or conviction that Father knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being. TEX. FAM. CODE § 161.001(b)(1)(D). A reasonable factfinder could also have formed a firm belief or conviction that Father engaged in a course of conduct that endangered the children's physical or emotional well-being. *Id.* § 161.001(b)(1)(E). This evidence is therefore legally sufficient to support the trial court's findings under subsections D and E. *See In re J.O.A.*, 283 S.W.3d at 344–45.

### 2. Factual sufficiency

In a factual sufficiency review we consider the entire record, including evidence that is contrary to the trial court's finding. *See id.* at 345. Here, there is no evidence that Father physically, emotionally, or sexually abused the children, and Perez and Rosales both testified that the two older children did not appear malnourished when the Department removed them. The trial court heard evidence that Father loves all three children, is a "great father," and was the two older children's primary caregiver until their 2018 removal. Additionally, Mother and Father testified that Mother did not live with Father and that Father did not know Mother had brought drugs into his home or that she planned to sell drugs on the day of the children's removal. Mother added that Father "would've kicked [her] out of the house" if he had known.

After considering somewhat analogous facts, our sister court recently held that the evidence it reviewed was legally sufficient but factually insufficient to support termination under subsections D and E. *See In re C.V.L.*, 591 S.W.3d 734, 751–52 (Tex. App.—Dallas 2019, pet. denied). *C.V.L.*, like this case, involved a father's appeal of endangerment findings that were based on evidence showing both of the child's parents had used drugs. *Id.* at 742–43. Also like this case,

the evidence in *C.V.L.* showed that the Department and the father agreed the mother should not have access to the child because she continued to use drugs and was not completing her services. *Id.* at 743. The evidence in *C.V.L.* also showed that while the father maintained contact with the mother early in the case, he later broke off that contact and complied with the Department's requirements. *Id.* at 745–46. As to the father's own past drug use, the court concluded that evidence was factually insufficient to show endangerment because "[t]his is not a case in which the Department alleged that Father used drugs in the child's presence, left the child in the care of drug users or in a home where drugs were present, or was ever arrested or incarcerated for drug possession." *Id.* at 752.

Here, in contrast, the Department presented evidence that Father, with full knowledge of Mother's drug problems, allowed Mother to frequently visit his home. The Department also presented evidence that Father maintained a relationship with Mother after the Department, the court, and Browne all warned him that doing so could jeopardize his chances of reunification and that Father subsequently worked with Mother to hide their relationship from the Department. *Cf. id.* Additionally, the Department presented evidence that Father used drugs in the home and allowed Mother and a least one other drug user into the home when the children were present; the children had access to drugs in Father's home; Father was arrested for drug possession in the children's presence; and Father used fake urine to falsify drug tests. *Cf. id.* While Father and Mother offered controverting testimony, the trial court had the sole authority to resolve those conflicts and to judge the credibility of the witnesses. *See, e.g., In re J.O.A.*, 283 S.W.3d at 346.

After reviewing the entire record, we conclude the evidence that is contrary to the trial court's findings is not so compelling that it would prevent a reasonable factfinder from forming a firm belief or conviction that Father knowingly allowed the children to remain in endangering conditions and engaged in conduct that endangered the children. TEX. FAM. CODE

§ 161.001(b)(1)(D), (E). We therefore hold the evidence is factually sufficient to support the trial court's predicate findings under subsections D and E. *See In re J.O.A.*, 283 S.W.3d at 345.

For the foregoing reasons, we overrule Father's first and second issues challenging the trial court's findings under subsection D and E. Because the evidence is legally and factually sufficient to support at least one predicate finding under section 161.001(b)(1), we need not consider Father's third and fourth issues challenging the trial court's finding under subsection O and its conclusion that Father did not satisfy his burden to establish an affirmative defense to subsection O. TEX. R. APP. P. 47.1; *In re A.V.*, 113 S.W.3d at 362.

### *Best Interest*

### *Applicable Law*

In his fifth issue, Father challenges the legal and factual sufficiency of the trial court's order that termination of his parental rights was in the best interest of the children. There is a strong presumption that a child's best interest is served by maintaining the relationship between a child and the natural parent, and the Department has the burden to rebut that presumption by clear and convincing evidence. *See, e.g.*, *In re R.S.-T.*, 522 S.W.3d at 97. To determine whether the Department satisfied this burden, the Texas Legislature has provided several factors[5] for courts to consider regarding a parent's willingness and ability to provide a child with a safe environment,

---

[5] These factors include, inter alia: "(1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills [. . .]; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child." TEX. FAM. CODE § 263.307(b).

and the Texas Supreme Court has used a similar list of factors[6] to determine a child's best interest. TEX. FAM. CODE ANN. § 263.307(b); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

A best interest finding, however, does not require proof of any particular factors. *See In re G.C.D.*, No. 04-14-00769-CV, 2015 WL 1938435, at \*5 (Tex. App.—San Antonio Apr. 29, 2015, no pet.) (mem. op.). Neither the statutory factors nor the *Holley* factors are exhaustive, and "[e]vidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest." *In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at \*3 (Tex. App.—San Antonio July 25, 2018, pet. denied) (mem. op.). Additionally, evidence that proves a statutory ground for termination is probative on the issue of best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). Finally, in determining whether termination of the parent-child relationship is in the best interest of a child, a factfinder may judge a parent's future conduct by his past conduct. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

*Application*

The children were six, five, and two years old by the end of the bench trial in this case. *See* TEX. FAM. CODE § 263.307(b)(1). There is no direct evidence as to the children's desires regarding conservatorship. *See Holley*, 544 S.W.2d at 371–72; *In re L.L.W.*, No. 04-15-00221-CV, 2015 WL 4638263, at \*3 (Tex. App.—San Antonio July 15, 2015, pet. denied) (mem. op.) (noting that a four-year-old and a thirteen-month-old "were too young to express such desires" but a six-year-old "might have been capable of expressing an opinion"). However, Father testified that he and

---

[6] Those factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the best interest of the child; (6) the plans for the child by these individuals or the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

the two older children had a strong bond and that he believed they were "going crazy for [him] right now." It is uncontroverted that Father loves his children, that he brought them clothes, food, and toys during visits, and that his visits with the children were appropriate and went well until he ceased visitation in October of 2020.

However, it is undisputed that both before and during the trial, Father was a regular user of marijuana, and he also tested positive for cocaine during this case. *See* TEX. FAM. CODE § 263.307(b)(8). We have previously recognized that drug use can destabilize the home and expose children to physical and emotional harm if not resolved. *See, e.g.*, *In re K.J.G.*, 2019 WL 3937278, at \*8; *see also Holley*, 544 S.W.2d at 371–72. Additionally, "[c]ontinued illegal drug use [by the parent] . . . is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct, and that termination is in the best interest of the child." *In re D.M.M.*, No. 14-16-00664-CV, 2017 WL 61847, at \*5 (Tex. App.—Houston [14th Dist.] Jan. 5, 2017, pet. denied) (mem. op.).

We do not hold that a parent's use of marijuana, standing alone, is sufficient to establish that termination is in a child's best interest. *See In re N.J.H.*, 575 S.W.3d 822, 836–41 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (Brown, J., concurring). Here, however, the Department presented evidence that both the home and the children smelled strongly of marijuana on the day of the children's removal, and that one of the children picked up a half-smoked marijuana cigarette off the floor. *See* TEX. FAM. CODE § 263.307(b)(12)(C), (D). While Father contends there is no evidence he smoked marijuana in front of the children, he does not dispute that he used marijuana in the home while the children were present; to the contrary, he testified that he would use "[in] the restroom or something." Father also does not dispute that the evidence shows he attempted to falsify drug tests. Although Father testified he would switch to legal CBD instead of marijuana if the children were returned to his custody, a trial court determining the best interest of a child "is

not bound to accept the truth or accuracy of a parent's testimony, either as to past actions or future intentions." *In re D.M.*, 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.). Moreover, the trial court heard evidence that Father had switched to CBD in the past, only to later resume using marijuana. Under these circumstances, the trial court could have reasonably determined that Father's drug use supported a finding that termination was in the children's best interest. *See* TEX. FAM. CODE § 263.307(b)(8), (11); *Holley*, 544 S.W.2d at 371–72.

Additionally, the Department presented evidence that Mother, who admitted her conduct endangered the children, "frequently" visited Father's home before the removal of the two older children. Father testified that Mother helped pay his bills, and he identified Mother as his primary source for marijuana. And, as noted above, the evidence shows Father continued to be in a relationship with Mother—and tried to hide that relationship from the Department—after he had been repeatedly warned that doing so could lead to the termination of his parental rights. *See* TEX. FAM. CODE § 263.307(b)(9), (11). The trial court could have reasonably determined that Mother's continued presence in Father's life could destabilize Father's home to the children's detriment. *See id.* § 263.307(b)(12)(D); *Holley*, 544 S.W.2d at 371–72.

The Department also presented Browne's testimony and notes regarding Father's self-described "personality of using people for his personal gain." *See* TEX. FAM. CODE § 263.307(b)(6). Based on Father's statements that he expressed affection toward Mother "only for his own [financial] benefit," Browne expressed concern that Father "might use these children for some financial benefit." *See id.*; *see also id.* § 263.307(b)(12)(D).

As Father notes on appeal, the Department did not present any evidence regarding its plans for the children. Father, in contrast, testified that he had "a basic plan" ready for the children that involved finding a new job, moving into a home in the school district where he wished to enroll the children, and obtaining financial help with S.A.S.'s daycare. *See Holley*, 544 S.W.2d at 371–

72. Father also testified, however, that his own family lives in San Antonio, that he has a contentious relationship with his family, and that his support system in Laredo, where he lived at the time of trial, consisted primarily of Mother and her family and friends. *See* TEX. FAM. CODE § 263.307(b)(13).

After reviewing the entire record under the appropriate standards of review, we conclude a reasonable factfinder could have formed a firm belief or conviction that termination of Father's parental rights was in the best interest of his children. *In re J.F.C.*, 96 S.W.3d at 266. Because legally and factually sufficient evidence supports the trial court's best interest finding, we overrule Father's fifth issue.

## CONCLUSION

We affirm the trial court's order of termination.

Beth Watkins, Justice